## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> v. <br><br> TCF NATIONAL BANK, <br><br> Defendant. | Case No. 17-cv-00166-RHK-KMM |

## <u>FIRST AMENDED COMPLAINT</u>

The Consumer Financial Protection Bureau (Bureau or Plaintiff) brings this action against TCF National Bank ("TCF" or "the Bank") under Sections 1031(a), 1036(a)(1), 1054, and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA") (codified at 12 U.S.C. §§ 5531(a), 5536(a)(1), 5564, and 5565); the Electronic Funds Transfer Act ("EFTA") (codified at 15 U.S.C. § 1693 *et seq*.) and its implementing Regulation E (codified at 12 C.F.R. Part 1005); and alleges:

1.      In late 2009, the Federal Reserve Board (the "Board") amended Regulation E, 12 C.F.R., § 1005.17, to establish new overdraft protections for consumers. The new rule focused on overdraft fees arising from debit card and ATM transactions, as those fees had proven particularly painful for consumers. Under the Board's new rule ("the Opt-In Rule"), consumers could not be charged overdraft fees on those

transactions unless they first affirmatively opted in to the Bank's overdraft service.

2. The Opt-In Rule posed a serious threat to TCF, which depends on overdraft revenue to a greater degree than its competitors. Over $180 million in revenue was at stake.

3. To protect that revenue, TCF devised and then executed a strategy to persuade its customers to opt in. The strategy had a number of elements, including: (a) incentivizing branch employees to sell Opt-In aggressively; (b) using an uninformative script that failed to mention fees; (c) structuring the Opt-In discussion in a way that interfered with consumers' ability to consider disclosures that would inform their decision; and (d) directing branch employees not to provide consumers with information that might discourage them from opting in.

4. TCF's strategy worked. From the Opt-In Rule's effective date through April 2014, the Bank persuaded approximately 66% of its customers to opt in to overdraft service for debit card and ATM transactions, and collected overdraft fees from hundreds of thousands of its customers.

5. This Opt-In rate was more than triple the average Opt-In rate at other banks.

6.      As explained in more detail below, TCF's approach to selling the overdraft service was both abusive and deceptive in violation of §§ 1031(c) and 1036(a)(1)(B); it also violated Regulation E, 12 C.F.R. § 1005.17, the implementing regulation of EFTA.

## JURISDICTION AND VENUE

7.      The Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law (12 U.S.C. § 5565(a)(1)), presents a federal question (28 U.S.C. § 1331), and is brought by an agency of the United States (28 U.S.C. § 1345).

8.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), and 12 U.S.C. § 5564(f). The Bank maintains its principal place of business in this district, does business in this district, and part of the events giving rise to the claims took place in this district.

## PLAINTIFF

9.      The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

10.     The CFPA is a Federal consumer financial law. 12 U.S.C. § 5481(14). Under Sections 1031 and 1036 of the CFPA, it is unlawful for any covered person to offer or provide to a consumer any financial product

or service not in conformity with Federal consumer financial law, or to otherwise commit any act or omission in violation of a Federal consumer financial law. 12 U.S.C. §§ 5531(a), 5536(a)(1)(A). It is also unlawful for any covered person to commit or engage in any unfair, deceptive or abusive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

11.     The Bureau is authorized to commence civil actions in federal district court, in its own name, to address violations of Federal consumer financial laws, including violations of the CFPA. 12 U.S.C. § 5564(b).

## **DEFENDANT**

12.     TCF is an insured depository institution with $21.1 billion in assets as of September 30, 2016. Therefore, TCF is an insured depository institution with assets greater than $10 billion within the meaning of 12 U.S.C. § 5515(a).

13.     "Deposit-taking activities" are a "financial product or service" within the meaning of 12 U.S.C. § 5481(15)(a)(iv).

14.     When a "financial product or service" is "offered or provided for use by consumers primarily for personal, family, or household purposes, it is a "consumer financial product or service" within the meaning of 12 U.S.C. § 5481(5)(A).

15.     TCF engages in deposit-taking activities for use by consumers primarily for personal, family, or household purposes. Therefore, TCF is a "covered" person as that term is defined by 12 U.S.C. § 5481(6).

16.     TCF operates a network of approximately 360 retail branch offices in Minnesota, Wisconsin, Illinois, Michigan, Colorado, Arizona, and South Dakota.

## THE OPT-IN RULE

17.     As described above, the Opt-In Rule prohibits banks from charging overdraft fees on ATM and one-time debit card transactions ("Covered Transactions") unless the account-holder has previously opted in or consented to overdraft coverage for those transactions.

18.     The Opt-In Rule is a Federal consumer financial law. 12 U.S.C. § 5481(14). Under Section 1036 of the CFPA, it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C § 5536(a)(1)(A). A violation of the Opt-In Rule is therefore a violation of Section 1036 of the CFPA.

19.     Before the Opt-In Rule was in place, most banks had provided overdraft coverage for Covered Transactions as a standard feature on

checking accounts. Consumers did not have the option to choose whether to subscribe to the service.

20.     The Board found that state of affairs concerning, because, among other things, many consumers lack understanding of the product's risks, costs, and conditions:

> [M]any consumers may not be aware that they are able to overdraft at an ATM or POS [Point of Sale]. Debit cards have been promoted as budgeting tools, and a means for consumers to pay for goods and services without incurring additional debt. Additionally, the ability to overdraft at an ATM or POS is a relatively recent development. Consequently, consumers may unintentionally overdraw their account based on the erroneous belief that a transaction would be paid only if the consumer has sufficient funds in the account to cover it.

74 Fed. Reg. 220 at 59038 (Nov. 17, 2009).

21.     Another risk the Board flagged was that the amount of the fee often far exceeded the transaction amount, such as, for example, where the consumer makes a $2 debit card purchase that overdraws the consumer's account and incurs a $35 fee.

22.     In short, banks were providing a service that posed substantial risks to consumers, without affording consumers the opportunity to decline it.

23.     To address this situation, the Opt-In Rule required banks to obtain consumers' affirmative consent or opt-in to overdraft coverage for

ATM and one-time debit card transactions ("Opt-In"). Only after obtaining

that consent could banks charge fees for the overdraft service.

24.     The Opt-In Rule became effective on July 1, 2010.

## TCF'S RELIANCE ON OVERDRAFT REVENUE

25.     Overdraft fees are an important source of revenue for many

banks; but at TCF, they are central to the Bank's business model.

26.     TCF's reliance on overdraft fees owes in large part to the

Bank's limited portfolio of consumer banking products. Unlike many other

banks its size, TCF does not generate substantial revenue from credit cards

and home mortgage loans. Instead, TCF relies largely on the revenue it

generates from its deposit base; and a substantial share of that revenue

comes from fees.

27.     TCF's CEO at the time the Opt-In Rule went into effect was

particularly attuned to how important overdraft fees are to TCF's success.

He even named his boat the *Overdraft*.

## TCF'S OPT-IN RATE

28.     Given TCF's dependence on overdraft fee revenue, the Opt-In

Rule posed a serious threat to its business model.

29.     In late 2009, the Bank estimated that $182 million in annual

fee revenue was "at risk due to Regulation E."

30.     To protect that revenue, TCF needed to get its customers to Opt In.

31.     In that, the Bank proved effective. As of mid-2014, approximately 66% of all TCF checking account customers had opted in, and hundreds of thousands of TCF customers had paid overdraft fees. This Opt-In rate was more than triple the average Opt-In rate at other banks.

32.     TCF's success relative to its peers in persuading its customers to Opt In appears to have been a matter of pride for the Bank. In the words of TCF's then-CEO William Cooper:

> Since implementation, we have seen a decline in overall fees and service charges, but this decline has been less significant than that of most of our competitors. Our success with Opt-In, as well as our implementation of new account maintenance fees, demonstrates our willingness and ability to meet regulatory challenges head-on.

33.     In 2010, the Bank held several Opt-In celebrations to commemorate its success – one to celebrate 300,000 Opt-Ins, and a second to celebrate 500,000 Opt-Ins. Senior executives attended both celebrations.

## TCF'S APPROACH TO SELLING OPT-IN

34.     TCF's high Opt-In rate was the result of a carefully orchestrated campaign to get its customers to Opt In. The key elements of that campaign are described below.

## Motivating Branch Employees

35.     TCF relied largely on its branch employees to solicit Opt-Ins. Thus, it was the tellers and branch supervisors who served as front line troops in the Opt-In campaign.

36.     To make sure those troops were motivated to make the sale, TCF offered them substantial financial incentives in 2010.

37.     Under TCF's incentive formula, branch managers could earn up to $7,000 depending on the number of Opt-Ins their branch achieved and branch size. Frontline employees were offered similar but smaller incentives.

38.     According to a TCF Director, the incentives were meant to "achieve as high an Opt-In [rate] as possible."

39.     Beginning in early 2011, TCF phased out direct incentives.

40.     However, at approximately that time, at least some of TCF's region managers began requiring their employees to meet Opt-In specific performance goals.

41.     Under these goals, branch employees were generally required to maintain an Opt-In rate of 80% or higher for all new accounts they opened. Branch managers, in turn, were required to meet the requirement for all accounts opened at their branch.

42.     TCF's corporate policy was that there should not be any adverse employment consequences associated with failing to attain any particular Opt-In rate.

43.     Nevertheless, many employees were led to believe they could lose their job if they did not meet sales goals, of which Opt-In goals were one component.

44.     Sales goals were taken very seriously at TCF, and they were often a source of great anxiety for employees. Consequences for failing to meet sales goals (of which Opt-In goals were one component) varied from state to state, but many employees generally understood they could be written up for falling short and that continued failure to meet a goal could ultimately result in termination.

45.     At monthly meetings, it was common for region managers to single out any branch manager who was struggling to meet the Opt-In goals, which, according to some branch managers, often felt like an act of public shaming. Typically, the region manager would then lead a discussion of strategies that branch manager could use to improve his or her performance.

46.     When a customer opening a new account declined to Opt In, the responsible branch manager often received a call from his or her region

manager asking what the problem was.

47.    Another former employee testified that TCF placed her on "probation" soon after she started because she was only getting approximately 50% of the customers for whom she opened accounts to Opt In.

48.    Opt-In goals were in effect in multiple branches in at least five of the states that TCF operated in (Minnesota, Michigan, Wisconsin, Colorado, and Illinois). In at least some of those states, the manager who had responsibility for overseeing all branches in the state participated personally in the effort to meet those goals.

## Crafting the Opt-In Pitch

49.    Beginning in the third quarter of 2009, TCF began to develop its communications strategy for Opt-In. The goal was to develop a sales pitch that would maximize the number of TCF customers that opted in.

50.    To that end, the Bank conducted several sessions of consumer testing, which the Bank referred to as the "Pilot Program."

51.    A 2009 memorandum summarizing the Pilot Program's findings included the following "Lessons Learned":

- "The Opt In Pilot was successful when we didn't over-explain it. Worked with the Operations Manager as there was a tendency to provide too much detail."

- "Keep it simple! When we used a basic, one sentence reference/explanation for Opt In, we were 99% successful...."

52.    As explained below, these two "lessons learned" ultimately shaped TCF's communications with its customers.

53.    The Pilot Program also experimented with various approaches for integrating the Opt-In decision into the Bank's account-opening process.

54.    The Opt-In Rule requires depository institutions to provide consumers with a notice describing the institution's overdraft service, including, among other things, an explanation of the consumer's Opt-In right and instructions for how to Opt In ("Notice"). 12 C.F.R. § 1005.17(b)(1).

55.    Based on consumer testing, the Bank learned that Opt-In rates varied dramatically depending on the proximity between the time consumers receive the Notice and their opportunity to make the Opt-In election.

56.    When customers could decide whether to Opt In while looking at the Notice, the "take rate" was 33%. But if the Bank had customers make their Opt-In election at another point in the process – when they were being asked to agree to other terms and conditions of the account – the "take rate" rose to 77%.

57.    As described below, the Bank chose to implement the latter strategy.

## TCF's Opt-In Pitch to New Customers

58.    Based in large part on the findings of the Pilot Program, TCF devised the pitch that its employees would use to present the Opt-In decision to customers who were opening a new account ("New Customers").

59.    The first step in the presentation was to provide the New Customer with a copy of TCF's version of the Notice. The employee opening the account generally did not summarize or explain the Notice. Nor did the employee direct the customer to read the Notice. Instead, the employee simply said in substance: "This is the federally-prescribed notice describing our overdraft service."

60.    The New Customer was not given the opportunity to make the Opt-In election at the time he or she received TCF's Notice.

61.    According to the testimony of former TCF employees, the vast majority of customers never looked at the Notice. Typically, the bank employee opening the account put the Notice into a folder with other documents and immediately moved on to the next step in the account-opening process (which had nothing to do with overdraft service), and the

document never came to the consumer's attention again.

62.     One former branch manager described it this way:

It was very quick.... There wasn't a big focus on it. It was this is
one more a piece of paper I'm handing to you. If a customer
did look, you'd be, oh, boy, they're probably going to opt out
after they have started reading. Most of the time, it was just
one more piece of paper. You would lead into that quickly
before the customer had an opportunity to read through it. It
would just end up in their new account packet. I don't think
anybody looks at those once they get home.

63.     After the Notice was set aside, the employee printed out a New

Account Agreement and placed it in front of the consumer.

64.     The New Account Agreement contained a series of items the

branch employee needed to review with the customer, and which the

customer needed to initial.

65.     The first four items – Arbitration Agreement

Acknowledgement; Fair Credit Reporting Act and Sharing of Information

Acknowledgement; Certification of Taxpayer Identification Number; and

Overdraft Fee Acknowledgement – were mandatory in the sense that the

consumer opening the account was required to initial them. If the

consumer refused to initial, the TCF employee would not let the consumer

open the account.

66.     TCF did not provide scripts for the employee to use while

going over these first four items. Rather, at each section, the employee

would typically direct the consumer to initial in order to acknowledge TCF's policy.

67.     As part of TCF's strategy to interfere with consumers' opt-in choice, the Opt-In section of the New Account Agreement came immediately after the four mandatory sections.

68.     Unlike the previous sections, TCF did provide a script for Opt-In ("New Account Script"). TCF summarized that "[t]he goal is to create a basic script where the banker is describing the account agreement as a whole, of which, Opt In is a component." According to the New Account Script, employees were directed to present the Opt-In decision as follows:

> This next section covers the Opt-In/Not Opt-In Election. By initialing here, you are allowing TCF to authorize and pay overdrafts on your ATM and everyday debit card transactions for this account. Please note that your decision does NOT affect any other transactions such as checks, ACH, or recurring debit card transactions.

69.     This was the "basic, one sentence reference/explanation for Opt In" that was, according to the Pilot Program, the key to being "99% successful" in obtaining Opt-Ins.

70.     The script's brevity was one reason it was so effective: the explanation was so short that consumers tended not to pay attention to the decision. One former branch manager explained this dynamic as follows:

> You know, one of the things that kind of was said I know sometimes from regional management and above, was the concept of just not

making a big deal about anything when you're having the conversation, kind of try to stick to a very basic script, try not to get into explaining or talking too much because that would then scare the customer off. So basically, it was the concept of saying as little as possible and trying to get them to opt in. So I can see where that would definitely lead to people being a little unsure as to what they are agreeing to.

71.     The script was also effective because it left consumers with the impression that opting in was mandatory. Former employees testified that the script fit smoothly into the style and rhythm of the preceding sections of the new account process; and that as a result, many consumers assumed that Opt-In was yet another item they had to agree to in order to open their account. One former branch manager described this effect as follows:

> Most of the Account Agreement is things they need to sign to continue the account opening process. We created an environment for them in which they trusted us and that we were friendly enough and that we were already pointing and initial or signing. At this point it is a different part of the Account Agreement process in which they don't have to sign for this account to stay open for them. I think because I was reading a script to them and they had a trust in me they would just assume that if I wanted them to initial, it was something they had to.

72.     Another former branch manager described the dynamic in this way:

> When you're opening an account, you know, you initial here, the customer's so comfortable with you, things are flowing. You read that and the customer initials and there you go, it's opted in. You know, there were your few and far between, you know, where customers understood that there had been a change in banking and that they had a choice. We didn't reiterate a choice.

16

73.     TCF's strategy documents make clear that it was precisely this effect the Bank was hoping to achieve. The memorandum summarizing the Pilot Program findings put it this way: the objective was to "develop scripting for Opt In *similar* to [the other terms New Customers had to initial] and *create a more fluid conversation* (vs. what occurs today)/basic, one sentence." (emphasis added)

74.     The New Account Script was also effective because of what it did not say. It characterizes opting in as a choice to allow the Bank to provide a benefit – paying the consumer's overdrafts. But it is silent as to the attendant risks and costs. Among other things, it fails to mention that by initialing the Opt-In section, consumers would be giving the Bank permission to charge them overdraft fees from which they would otherwise be protected. In fact, the script did not even mention the word fees.

75.     The TCF executive heading up TCF's Opt-In initiative confirmed in testimony that the TCF script focused on the benefits of opting in while omitting any mention of the risks in order to maximize the number of Opt-Ins.

76.     Although the Opt-In section of the New Account Agreement included a written disclosure, consumers rarely read these disclosures because they came at the end of the account-opening process, by which

17

point (as the Pilot Program anticipated) consumers had already fallen into a rhythm of initialing the terms of the agreement and moving on.

77.    Former branch employees testified that they and their colleagues rarely if ever tried to supply consumers with additional information.

78.    Providing information beyond what was in the script was known internally as "over-explaining." There was a general recognition that "over-explaining" would lead to lower Opt-In rates, and thereby jeopardize Opt-In goals and incentives.

79.    The Pilot Program specifically identified "over-explaining" as an obstacle to meeting TCF's Opt-In goals.

80.    As a result, many employees avoided explanations to clarify the script, even when consumers appeared not to understand that (a) by initialing the Opt-In section, consumers were agreeing to be charged fees; or (b) consumers were not required to initial the Opt-In section in order to open an account.

81.    The Director of all TCF branches in Michigan used the following language to explain how he was dealing with two branch managers who were not meeting their Opt-In numbers:

> I have reviewed the Opt-In new reports and had LONG conversations with [two branch managers] regarding their Opt-In percentage and the way they present this to customers.

In an effort to disclose everything, I believe both of them have been overexplaining this election. When I asked them what they say, it appears that Opt-In takes most of their account opening time. I spoke to them about answering customers' questions, but mainly sticking to the script with the account agreement. With the state averaging 78% and their branches (and themselves) at 58% or so, this is a big problem.

82.     According to former employees, the majority of New Customers (several former employees estimated the number to be 80%) simply initialed the form after hearing the script without asking further questions. That meant they were opted in and therefore fair game for TCF's overdraft fees.

83.     Many former employees believed that thanks to TCF's sales tactics, consumers often did not understand the decision they had made. One former branch manager, for example, testified that "I don't think [New Customers] understood that they -- that they were exposing [them]selves to additional fees or that they had the option to stop the additional fees."

84.     While most New Customers simply opted in after hearing the script, there were some who asked questions or indicated they were disinclined to Opt In. In those circumstances, TCF instructed branch employees to try to persuade the customers to Opt In. In TCF parlance, this was referred to as "overcoming objections."

85.     The most important tool for overcoming objections was

hypotheticals. Typically, the hypotheticals described a situation where the customer would need to pay for something, but the transaction would be declined unless the customer had opted in. Branch employees were encouraged to tailor the hypothetical for maximum emotional resonance. One former employee described the use of hypotheticals as follows:

> The major strategy would be to present an example of how it benefited the customer. It tugged at your heart strings. It usually was related to an emergency situation in which you needed funds. Some of the examples I would use is, "We live in Minnesota too. It is cold outside. You are on the side of the road. You know your account has $50 in it. You know to get a service call it is going to cost you $80. You have to get it fixed. So you make that call. If you are opted in, we will pay it. You get an overdraft fee. If you don't Opt-In, it declines you. You might get stuck on the side of the road," kind of like scare tactics. You do the same thing with the grocery store. You have to get milk. It is an emergency situation. It was scare [tactics].

86.    Former branch employees testified that employees never used hypotheticals that highlighted the risks of opting in. As a result, TCF customers never heard hypotheticals about being charged a $37 fee for a $4 purchase. Such hypotheticals fell into the category of "over-explaining," and were discouraged.

### TCF's Pitch to Existing Customers

87.    TCF also had to devise strategies for presenting the Opt-In decision to customers who already had an account when the Opt-In Rule became effective, but who, because of the law change, could not be charged

fees unless TCF obtained affirmative consent ("Existing Customers").

88.     One of TCF's most important means of obtaining Opt-Ins from Existing Customers was a telephone call campaign. TCF provided branch employees scripts to use on those calls, which varied in minor ways depending on the customer's circumstances, but shared a basic structure. The scripts did not reference the required written Notice or confirm that customers had received it.

89.     In a typical call, the employees would begin by introducing herself. She would then say something like the following: "I am calling today regarding your TCF check card and some upcoming changes that would limit the usage of your card. Would you like your TCF Check Card to continue to work as it does today?"

90.     Former employees testified that the majority of consumers answered "yes" to that question. TCF considered that "yes" as an indication that the customer wanted to Opt In, and employees would enroll customers into overdraft services.

91.     When customers did not answer "yes," TCF employees were trained to use the same "overcoming objections" strategies discussed above, including the hypotheticals.

92.     Some of the call scripts included additional strategies as well.

One script directed the TCF caller to tell the customer that not opting in "could cause you a real problem. In order for TCF to continue authorizing your transactions, you must consent or Opt-In to this service. We would definitely suggest you Opt In, to allow TCF the flexibility to approve your card transactions."

93.    Another script was to be used for customers who indicated they were not interested in Opting In:

> I understand your concern, but typically we find that customers whose check card transactions are authorized when they [do] not have enough available funds do have sufficient funds when the transaction posts to the account.

94.    If customers indicated they wanted their "account to continue to work as it does today," the scripts called for the TCF caller to recite a short disclosure:

> You will pay nothing extra for TCF's Overdraft Service. However, you will be charged an overdraft fee – currently $35 per item – if you overdraft your account. This includes overdrafts by check teller withdrawals, ATM and card transactions, ACH and other electronic transactions.

95.    That disclosure describes TCF's Overdraft Service as a whole, including how the service applies to checks and ACH transactions, even though such transactions were outside the scope of the Opt-In decision.

96.    After reading the disclosures, the TCF employees were directed to ask the consumer to confirm his or her decision to Opt In. This

did not always happen.

97.     In all cases, consumers did not hear the disclosures until after they had already expressed their preference to have their card continue to work as it did at the time (which TCF chose to interpret as a decision to Opt In).

98.     On some scripts, the TCF employee only read the disclosure if the customer expressed interest in hearing it.

99.     It was no accident that TCF presented the Opt-In choice in terms of whether the consumer wanted the account "to continue to work as it does today." TCF understood that consumers generally prefer to avoid making changes to their accounts, since changes typically come with new risks or costs. As a result, consumers are generally inclined to keep their accounts *as is*.

100.     The TCF executive in charge of developing a strategy for presenting Opt-In to Existing Customers explained it this way:

> We felt that the majority of customers would probably choose to opt in based on the fact it would not change the fundamental way that their account worked today. And that, any change that we've ever introduced to a customer on their account has typically been viewed negative. I'm not just talking about opt-in, I'm talking about anything. They want to know what it is, why it is, how is this going to impact me. So, when you use the word "change" it's typically not something they snuggle up with, shall I say.

101.     In fact, because of the Opt-In Rule, it was the consumers who

chose to have their account "continue to work as it does today" who were taking on the new risk.

102.    Former employees testified that Existing Customers experienced confusion similar to that of New Customers – namely, they did not understand that TCF could not charge them overdraft fees unless they gave permission or that by opting in they were giving that permission. One former branch manager explained Existing Customers' lack of understanding this way:

> They figured the way they had been using their check card had been working for them in the past however long they had been using it. They did not know that they had the choice to opt out and that their card could be denied if they didn't have the funds available.... [T]hey didn't know what the alternative was. They didn't know that really they had a choice. Many customers were like, yes, I'm fine with the way my card is working right now. Very few customers in response would say, "What other choice do I have?" That just wasn't a topic that came up.

103.    TCF pitched Opt-In to Existing Customers through a number of other communications channels as well. When, for example, Existing Customers came into the branch on other business, such as to make a deposit or get a bank check, tellers were instructed to bring up Opt-In. TCF's communication strategy for those other channels more or less tracked the approach the Bank used in the call campaign.

104.    TCF has charged overdraft fees to Existing Customers.

## VIOLATIONS OF THE
## CONSUMER FINANCIAL PROTECTION ACT

### Count I
### Abusive Acts or Practices as to New Customers

105.   The Bureau incorporates the allegations in Paragraphs 1 through 104 by reference.

106.   Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices." 12 U.S.C. § 5536(a)(1)(B).

107.   An act or practice is abusive if, among other things, it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).

108.   Overdraft Service for ATM and one-time debit card transactions is a "consumer financial product or service" as that term is defined in § 1002(5) of the CFPA, 12 U.S.C. § 5481(5).

109.   Overdraft Service for Covered Transactions is subject to, inter alia, the following terms and conditions:

a.   Financial institutions cannot charge Overdraft Fees for Covered Transactions unless the consumer gives affirmative consent;

b.   TCF considered the customer's act of initiating the Opt-In

section of the New Account Agreement to be "affirmative consent."

   c.   When the consumer has Opted In, TCF pays Covered Transactions even when the consumer lacks sufficient available funds to cover them, and then charges an Overdraft Fee.

   d.   TCF applied its standard Overdraft Fee to Covered Transactions, even when the amount of the purchase was far lower than the fee charged.

110.   Until at least the end of 2013, TCF materially interfered with its New Customers' ability to understand those terms and conditions by:

   a.   Using an account-opening process that interfered with customers' ability to read the Notice;

   b.   Using an account-opening process that interfered with customers' ability to consider the contents of the Notice when they made their Opt-In decision;

   c.   Using an account opening process that effectively replaced the disclosures contained in the Notice with a script that characterized Opt-In as a benefit without adequately disclosing other relevant terms and

conditions, including fees;

d.   Presenting the Opt-In decision with a short, cursory explanation and as if it were one in a series of acknowledgements that consumers were required to make to open their account, which in numerous instances led consumers to believe that opting in was mandatory;

e.   Directing branch employees not to provide consumers with information that would correct their lack of understanding;

f.   Incentivizing branch employees, through both positive and negative incentives, to reach unreasonably aggressive sales targets; and

g.   Training branch employees that, while they should not answer consumer questions or provide consumers with clarifying information, employees could emphasize the benefits of opting in with one-sided hypotheticals.

111.   Therefore, TCF's acts or practices, as described in Paragraph 109, constitute abusive acts or practices in violation of the CFPA, 12 U.S.C. §§ 5531(a) & (d)(1), and 5536(a)(1)(B).

## Count II

## Deceptive Acts or Practices as to New Customers

112.   The Bureau incorporates the allegations in Paragraphs 1 through 104 by reference.

113.   As described in paragraphs 58 through 86 above, until at least the end of 2013, TCF:

> a.   Used an account-opening process that discouraged consumers from reading the Notice;
>
> b.   Used an account-opening process that discouraged consumers from looking at or thinking about the Notice when they made their Opt-In decision;
>
> c.   Used an account-opening process that effectively replaced the disclosures contained in the Notice with a script that characterized Opt-In as a benefit and did not adequately disclose other relevant terms and conditions, including fees; and
>
> d.   Presented the Opt-In decision with a short, cursory explanation and as one in a series of acknowledgements that consumers had to make to open their account.

114.   As a result, the net impression left by TCF's process was that

there was no cost to opting in.

115.    In truth and in fact, by opting in consumers were exposing themselves to overdraft fees from which they would otherwise have been protected.

116.    TCF's process also created the net impression that initialing the Opt-In section of the New Account Agreement was mandatory.

117.    In truth and in fact, opting in was optional.

118.    Therefore, TCF's representations and omissions as set forth in Paragraphs 112 through 116 are false and misleading, and constitute deceptive acts or practices in violation of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## Count III

## Violation of Regulation E as to New Customers

119.    The Bureau incorporates the allegations in Paragraphs 1 through 104 by reference.

120.    Under the Opt-In Rule, a financial institution may not charge overdraft fees on ATM and one-time debit card transactions unless it first "[o]btains the consumer's affirmative consent, or Opt-In, to the institution's payment of ATM or one-time debit card transactions[.]"  12 C.F.R. § 1005.17(b)(ii) and (iii).

121.    As described in paragraphs 58 through 86 above, TCF failed to obtain the affirmative consent of New Customers by:

    a.   Using an account-opening process that discouraged consumers from reading the Notice when presented;

    b.   Using an account-opening process that discouraged consumers from looking at or thinking about the Notice when they made their Opt-In decision;

    c.   Using an account-opening process that effectively replaced the disclosures contained in the Notice with a script that characterized Opt-In as a benefit and did not adequately disclose other relevant terms and conditions, including fees; and

    d.   Presenting the Opt-In decision as if opting in was a mandatory pre-condition to opening the account.

122.    As a result, New Customers did not affirmatively consent to the payment of their ATM and one-time debit card transactions in exchange for a fee. When TCF charged those consumers overdraft fees on Covered Transactions, it was therefore without their affirmative consent, in violation of the Opt-In Rule, the EFTA, 15 U.S.C. §§ 1693, et seq., and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## Count IV

## Violation of Regulation E as to Existing Customers

123.    The Bureau incorporates the allegations in Paragraphs 1 through 104 by reference.

124.    Under the Opt-In Rule, a financial institution may not charge overdraft fees on ATM and one-time debit card transactions unless it first provides a "reasonable opportunity" for consumers to affirmatively consent and "[o]btains the consumer's affirmative consent, or Opt-In, to the institution's payment of ATM or one-time debit card transactions[.]"  12 C.F.R. § 1005.17(b)(ii) and (iii).

125.    As described in paragraphs 87 through 104 above, TCF pitched overdraft service for Covered Transactions to Existing Customers by asking whether they wanted their account to "continue working as it does today."

126.    That framing of the decision turned Overdraft Service for Covered Transactions into the default position. To avoid that default, consumers had to choose to change the way their accounts worked.  In effect, TCF changed the election from an Opt-In to an Opt-Out.

127.    As a result, Existing Customers did not have a reasonable opportunity to consent nor did they affirmatively consent to the payment of their ATM and one-time debit card transactions in exchange for a fee.

128.   When TCF charged those consumers overdraft fees on Covered Transactions, it was therefore without their affirmative consent, in violation of the Opt-In Rule, the EFTA, 15 U.S.C. §§ 1693, et seq., and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## **PRAYER FOR RELIEF**

Wherefore, the Bureau requests that the Court:

a.  Permanently enjoin TCF from committing future violations of the CFPA and Regulation E;

b.  Award such relief as the Court finds necessary to redress injury to consumers resulting from TCF's violations of the CFPA and Regulation E, including, but not limited to, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

c.  Impose civil money penalties against TCF;

d.  Award Plaintiff its costs in connection with prosecuting this action; and

e.  Award other and additional relief as the Court may determine to be just and proper.

Dated: March 1, 2017

Respectfully submitted,


ANTHONY ALEXIS
Enforcement Director

CARA PETERSEN
Deputy Enforcement Director
For Litigation

JAMES T. SUGARMAN
Assistant Litigation Deputy

_____*/s/ Owen P. Martikan*_____
Owen P. Martikan
owen.martikan@cfpb.gov
ph: (415) 844-9790
Michael P. Favretto
michael.favretto@cfpb.gov
ph: (202) 435-7785
Jack Douglas Wilson
doug.wilson@cfpb.gov
ph: (202) 435-9151

Consumer Financial Protection
Bureau
1700 G Street NW
Washington, DC 20552