## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Consumer Financial Protection Bureau,

                    Plaintiff,

v.

TCF National Bank,

                    Defendant.

Civ. No. 17-166 (RHK/DTS)
**MEMORANDUM OPINION
AND ORDER**

---

Owen Martikan, Consumer Financial Protection Bureau, San Francisco, California, Jack Douglas Wilson, Michael P. Favretto, Consumer Financial Protection Bureau, Washington, D.C., Chad Blumenfield, United States Attorney's Office, Minneapolis, Minnesota, for Plaintiff.

John K. Villa, Edward J. Bennett, Ryan T. Scarborough, Williams & Connolly LLP, Washington, D.C., Andrew L. Sandler, Andrea K. Mitchell, Buckley Sandler LLP, Washington, D.C., Timothy D. Kelly, Kristina Kaluza, Dykema Gossett PLLC, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

In this action, the Consumer Financial Protection Bureau (the "Bureau")[1] alleges

Defendant TCF National Bank ("TCF") violated federal law in connection with overdraft

services offered to its customers.  Presently before the Court is TCF's Motion to Dismiss.

For the reasons that follow, the Motion will be granted in part and denied in part.

---

[1] The Bureau was created as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank"), to ensure "that markets for consumer financial products and services are fair, transparent, and competitive."  12 U.S.C. § 5511(a).  It is an independent agency within the Federal Reserve System.  § 5491(a).

## BACKGROUND

The Amended Complaint alleges the following facts.  TCF is a national bank with more than $21 billion in assets and over 360 branches in the Midwest, Colorado, and Arizona.  (Am. Compl. ¶¶ 12, 17.)  It offers a number of products and services to its customers, including overdraft services for debit-card and ATM transactions.  (Id. ¶¶ 1, 3, 25.)  Although not precisely described in the Amended Complaint, in its brief TCF describes these services as "extend[ing] short-term, unsecured credit to enrolled customers by honoring transactions that would otherwise be declined because they would overdraw the customers' accounts."  (Def. Mem. at 6.)  Prior to 2009, TCF provided overdraft coverage as a standard feature of its checking accounts.  (Am. Compl. ¶ 19.)

In November 2009, the Federal Reserve Board[2] amended "Regulation E," 12 C.F.R. § 1005.17, an implementing regulation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.*  It noted that many banks, like TCF, automatically enrolled customers in overdraft services, charging fees to unaware account holders if debit-card or ATM transactions overdrew their accounts, rather than simply declining the transactions. Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,035 (Nov. 17, 2009).  In fact, in some instances the amount of the fee charged by the bank far exceeded the amount of the overdraft caused by the transaction.  (Am. Compl. ¶ 20.)  To rectify this, Regulation E was amended effective July 1, 2010, to require banks to obtain their customers' "affirmative consent," or "opt-in," to overdraft services for debit-card and ATM

---

[2] The Federal Reserve Board is the seven-member governing body of the Federal Reserve, the entity tasked with regulating nationally chartered banks such as TCF.

transactions.  In order to charge for these services following the amendment, a bank was required to (1) provide the customer a written notice "segregated from all other information" describing its services, (2) provide a reasonably opportunity for the customer to consent, (3) obtain the customer's consent, and (4) provide written confirmation of the customer's election, including a statement advising that the customer could withdraw consent at any time.  12 C.F.R. § 205.17(b)(1)(i)-(iv).

TCF, of course, was required to comply with the newly amended Regulation E, and the Amended Complaint expressly alleges that it provided the required notice to its customers.  (Am. Compl. ¶ 59.)  But according to the Amended Complaint, TCF had a more limited portfolio of banking products than other banks of its size and was heavily dependent on fees, including overdraft fees.  (Id. ¶ 26.)  As a result, it alleges that in response to Regulation E's amendment, TCF undertook an aggressive campaign to enroll its customers in overdraft services.  For example, it used consumer testing to develop the most effective way to gain customers' consent, which revealed they agreed to the services at a much higher rate (77% versus 33%) if they were asked to consent well after being provided the opt-in notice, in particular "when they were being asked to agree to other terms and conditions of the account."  (Id. ¶¶ 55-56.)  It also learned that the less it explained to customers about the services, the more likely it became that customers would consent.  (Id. ¶¶ 51, 78.)  TCF also stressed with its employees the importance of opt-in services, including offering cash incentives to tellers and managers to encourage them to obtain "as high an opt-in [rate] as possible."  (Id. ¶ 38.)  It allegedly undertook similar efforts with then-existing customers (as opposed to new customers), crafting a

script to be read over the phone warning of "upcoming changes" that would "limit" the "usage of [their ATM] card[s]," and asking if they would like the cards to "continue to work as [they do] today." (Id. ¶ 89.) If a customer answered in the affirmative, he or she was then enrolled in overdraft services. (Id. ¶ 90.)

According to the Amended Complaint, TCF's efforts were successful: by mid-2014, approximately two-thirds of TCF checking-account customers had opted in to overdraft services for debit-card and ATM transactions, a rate more than triple that of comparable banks. (Id. ¶ 31.) The Bureau contends, however, that TCF's campaign ran afoul of both the Consumer Financial Protection Act of 2010 ("CFPA")[3] and Regulation E. Its four-Count Amended Complaint alleges that TCF violated the CFPA by engaging in abusive (Count I) and deceptive (Count II) practices as to new customers, and that it violated Regulation E as to both new (Count III) and existing (Count IV) customers. TCF has now moved to dismiss each of these claims. Its Motion has been fully briefed and is ripe for disposition.[4]

## STANDARD OF DECISION

A complaint will survive a motion to dismiss only if it includes "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007). A "formulaic recitation of the elements of a cause of action"

---

[3] The CFPA comprises Title X of Dodd-Frank, 124 Stat. 1955 (codified in various sections of Title 12 of the United States Code), and had an effective date of July 21, 2011.

[4] A group of fourteen bankers' associations, representing nearly 2,500 banks, has submitted a memorandum, with leave of Court, as *amicus curiae* in support of TCF's Motion. The Court appreciates their submission.

will not suffice.  Id. at 555; accord Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather,

the plaintiff must set forth sufficient facts in his Complaint to "nudge[] the[] claim[]

across the line from conceivable to plausible."  Twombly, 550 U.S. at 570.  "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a [party] has acted unlawfully."  Iqbal, 556 U.S. at 678 (quoting

Twombly, 550 U.S. at 556).  In reviewing such a motion, the Court "must accept a

plaintiff's specific factual allegations as true but [need] not . . . accept . . . legal

conclusions."  Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing

Twombly, 550 U.S. at 556).[5]

## ANALYSIS

### I.    The CFPA claims (Counts I and II)

Congress enacted the CFPA in the wake of the banking and financial crisis of the

late 2000s.  The statute aimed to protect consumers by increasing oversight of national

banks and clarifying the laws governing financial transactions.  As relevant here, the

CFPA prevents a bank such as TCF from engaging in any "unfair, deceptive, or abusive

act or practice . . . in connection with any transaction with a consumer for a consumer

financial product or service," such as overdraft services.  12 U.S.C. § 5531(a).  TCF

---

[5] TCF submitted a number of documents with its Motion, which the Court has not considered.
See, e.g., Stahl v. U.S. Dep't of Agric., 327 F.3d 697, 701 (8th Cir. 2003) (court has "complete
discretion" to decide whether to consider documents beyond the pleadings and treat motion as
one for summary judgment).  It does not appear those documents would alter the outcome in any
event.  Furthermore, at oral argument TCF's counsel prepared a demonstrative chart to which the
Bureau objects.  (See Doc. No. 83.)  As the outcome is not impacted by the demonstrative, the
Objection will be overruled as moot.

argues that the conduct alleged by the Bureau in the Amended Complaint is insufficient to state a claim under this statute.  The Court disagrees.[6]

An act is *abusive* under the CFPA if it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).  Similarly, an act is *deceptive* under the statute if it concerns a material matter and is "likely [to] mislead [a] consumer acting reasonably under the circumstances."  Consumer Fin. Prot. Bureau v. Mortgage Law Grp., LLP, 196 F. Supp. 3d 920, 939 (W.D. Wis. 2016).[7]  The thrust of TCF's argument is that it provided a written notice – a *federally mandated* written notice under Regulation E – to all new customers, making clear that overdraft services were optional.  (See Def. Mem. at 26 ("[A]ll the information the customer needs to understand his decision is clearly presented in the written documents.").)  In the absence of any allegation TCF employees advised customers not to read the notice or provided information contradicting it, TCF argues it cannot have engaged in "abusive" or "deceptive" conduct.  (Id. at 27 ("By providing customers with unchallenged written disclosures . . ., TCF gave New Customers the ability to understand the service it offered."); id. at 20 ("The deception claim cannot withstand these unambiguous disclosures.").)

---

[6] The Court rejects TCF's assertion that CFPA claims must be pleaded in accordance with Federal Rule of Civil Procedure 9(b)'s heightened-particularity requirement.  See, e.g., Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C., 114 F. Supp. 3d 1342, 1371 (N.D. Ga. 2015).

[7] The CFPA does not define the term "deceptive," but the parties agree it has the same meaning as under the Federal Trade Commission Act.

The problem with this argument is that written notice alone cannot immunize TCF from liability, because (as TCF recognizes) "the entire . . . transaction or course of dealing [must] be considered." (Id. at 18 (first alteration added) (internal quotation marks and citation omitted).) And here, that is precisely the Bureau's point: while TCF provided the required notice, the bank's alleged conduct as part of the account-opening process was likely to deceive or confuse customers about its overdraft services. The Amended Complaint alleges that TCF provided the mandated notice early in the process and then pushed it aside, only later asking customers to opt in after providing a flurry of other account information. (Am. Compl. ¶¶ 59-67.) It further alleges that customers were asked to initial their opt-in elections immediately after being asked to initial four other items that were *mandatory* in order to open a TCF account. (Id. ¶¶ 65, 67.) And, it alleges bank employees were directed to use a short and uninformative script when discussing these other items, in order to falsely convey the impression they were part and parcel of one document and necessary to open an account. (Id. ¶ 71 ("The script was [] effective because it left consumers with the impression that opting in was mandatory.").) Accepting these allegations as true, as required at this juncture, the Court cannot say the Bureau has failed to plausibly allege abusive or deceptive conduct simply because the required notice was provided at some point during the account-opening process. See, e.g., FTC v. Cyberspace.com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates[,] even though the solicitation also contains truthful disclosures."); FTC v. BF Labs. Inc., No. 4:14-CV-815, 2014 WL 7238080, at *5 n.6 (W.D. Mo. Dec. 12, 2014) (same); see also Khoday v.

Symantec Corp., 93 F. Supp. 3d 1067, 1087-88 (D. Minn. Apr. 27, 2015) (Tunheim, J.) (noting that "a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer" is actionable under state unfair-competition law).

TCF argues that guidance previously issued by the Federal Reserve made clear the required notice could be provided to consumers at any point "*prior to* or at account-opening."  It contends it complied with this longstanding practice by issuing the notice to new customers prior to asking them to initial the documents necessary to open accounts, including the opt-in to overdraft services.  (Def. Mem. at 25 (emphasis in original).)  To change that interpretation and impose liability now, it argues, would violate due process. (Id. at 25-26; Reply at 8.)

But the Court perceives no *ex post facto* problem.  When Regulation E was amended, banks were expressly advised they could not "market their overdraft services in a manner that constitutes an unfair or deceptive practice within the meaning of the Federal Trade Commission Act," 75 Fed. Reg. at 31,671, and as already noted, the statute made clear written disclosures alone, even if accurate, would not protect an entity undertaking conduct leaving a confusing or misleading "net impression" on a customer. Moreover, while providing written notice early in the account-opening process is part of the factual basis for the Bureau's claims, it is not the only part.  Rather, that allegation works in tandem with the assertion that consumers were pressed to initial a number of required items at the same time they were asked whether they opted-in to overdraft services.  TCF and other banks were expressly warned that such conduct could transgress the law.  See 74 Fed. Reg. at 59,041 (noting that banks must ensure "that the terms of the

overdraft service are not obscured by other account information"); see also 74 Fed. Reg.

at 59,055 ("A consumer's affirmative consent, or opt-in, to a financial institution's

overdraft service must be obtained separately from other consents or acknowledgements

obtained by the institution."). Previous guidance suggesting the notice may be provided

"prior to" account opening, therefore, does not necessarily preclude liability.[8]

For these reasons, the Court rejects TCF's arguments that the Bureau has failed to

allege plausible claims under the CFPA. However, the Court agrees that the Bureau

cannot assert claims under the statute arising before July 21, 2011, the CFPA's effective

date. The Bureau attempts to salvage earlier claims under a type of continuing-violation

theory, arguing it has "alleged conduct violating the CFPA that post-dates its effective

date." (Mem. in Opp'n at 22.) But accepting the Bureau's argument theoretically could

render unlawful every account opening ever conducted by TCF, since some of them

occurred after the CFPA's effective date. That is clearly not the law. See, e.g., Caviness

v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1220 (8th Cir. 1997).

## II.    The Regulation E claims (Counts III and IV)

Although the Court concludes the Bureau has plausibly alleged claims under the

CFPA, it reaches a different conclusion with respect to the claims under Regulation E.

As previously noted, Regulation E prescribes, *inter alia*, four things banks must do in

---

[8] TCF also notes it was obligated to provide the notice "segregated from all other information."
12 C.F.R. § 205.17(b)(1)(i). But the Court does not believe this insulates it from a claim that the
notice was provided so far in advance of, and divorced from, the opt-in election to undermine the
notice's effectiveness. Nor does the argument address the Bureau's contention that consumers
were pushed to initial their opt-in election at the same time as several other mandatory account
elections.

connection with their overdraft services:  (1) provide a written notice "segregated from all other information" describing the services, (2) provide a reasonable opportunity for a customer to consent, (3) obtain the customer's consent, and (4) provide written confirmation of the customer's election, including a statement advising that the customer may withdraw consent at any time.  12 C.F.R. § 205.17(b)(1)(i)-(iv).  The Bureau alleges TCF violated the Regulation in two ways, but the Court disagrees.

"*Reasonable opportunity.*"  The Bureau's main argument is that TCF failed to provide customers with a "reasonable opportunity" to consent to its overdraft services.  To be sure, it would not be a stretch to conclude the so-called "abusive" or "deceptive" conduct described above also might fail to provide customers with a "reasonable opportunity" to opt in to overdraft services.  For example, according to the Bureau, TCF violated Regulation E because "it called [existing] customers and elicited their verbal consent immediately, without disclosing what they were consenting to."  (Mem. in Opp'n at 25-26.)  This was unlawful, it says, because a "reasonable opportunity to consent requires that consumers know to what they are consenting."  (Id. at 26.)

But the critical difference between the Regulation E claims alleged in Counts III and IV, and the CFPA claims alleged in Counts I and II, is the distinction between the conduct forbidden by the two.  As the Bureau noted both in its brief and at oral argument (see Mem. in Opp'n at 14; 6/21/17 Hr'g Tr. at 30), Regulation E is narrower than the statute, which broadly attaches to "abusive" or "deceptive" practices.  Regulation E, on the other hand, specifies with almost surgical precision the information banks must convey to consumers in connection with overdraft services – a description of the services,

the right to opt-in (or not), and so on – and the ways in which they may obtain

consumers' consent.  Indeed, the Regulation includes a host of model forms banks are

encouraged to use to describe overdraft services and obtain their customers' elections.

Viewed through this lens, it becomes clear the "reasonable opportunity" claim

fails.  The Bureau alleges that by (purportedly) engaging in conduct transgressing the

CFPA, TCF also violated Regulation E's "reasonable opportunity" requirement.  But in

discussing the Regulation, the Federal Reserve explained that a "reasonable opportunity"

to consent to overdraft services is provided when, "among other things, [a bank] provides

reasonable *methods* by which the consumer may affirmatively consent."  74 Fed. Reg. at

59,042.  The emphasized word is key:  it focuses on the *means* customers are offered to

consent to overdraft services.  Indeed, the Federal Reserve offered examples of a

"reasonable opportunity" to consent in commentary leading up to the amendment of

Regulation E:  providing either "a written form that the consumer can complete and

mail," a toll-free telephone number customers may call, electronic means to opt-in online

(such as a specified internet address), or a form that may be filled out and submitted in

person.  Id.; accord 74 Fed. Reg. at 59,055.  In the Court's view, therefore, the

"reasonable opportunity" contemplated by the Regulation concerns only the manner in

which consent may be obtained, and nothing more.  Not only is that consistent with the

text of the Regulation – discussing an reasonable *opportunity* to consent – but it is also

consistent with the intent behind the Regulation, namely, to delineate specific

information banks must provide to consumers, not to more broadly prevent misleading or

deceptive conduct in connection with the opt-in decision – the purview of the CFPA.

Here, the Amended Complaint nowhere alleges that TCF failed to provide reasonable or appropriate *means* for consumers to provide consent.  Indeed, it expressly alleges that customers were asked to initial an opt-in form (Am. Compl. ¶ 67), one of the precise methods of consent endorsed by the Federal Reserve, or convey their consent orally.  Accordingly, the Court concludes that this claim fails.

The Bureau notes that if the Federal Reserve had simply wanted banks to provide reasonable *means* to opt in to overdraft services, Regulation E would have used that language rather than the (arguably broader) phrase "reasonable *opportunity*."  (Mem. in Opp'n at 27 (emphasis added).)  And to be sure, the Federal Reserve's guidance could be clearer.  But in the Court's view, and as the *amici* point out, Regulation E is quite specific and is primarily intended to lay out the precise information banks must communicate and "the exact means by which banks can obtain a customer's affirmative consent to Opt-in." (Doc. No. 41 at 4.)  It would contravene this specificity to imbue the phrase "reasonable opportunity" with elastic concepts such as "abusiveness" or "deception."  Indeed, the Federal Reserve did not mention abusive or deceptive conduct when describing a "reasonable opportunity," begging the question:  why would Regulation E need to proscribe such conduct when it is already banned by a statute (the CFPA) banks were expressly counseled to consider when marketing overdraft services?

The Bureau also notes the Federal Reserve *did* state in commentary that, "*among other things*," a reasonable opportunity to consent exists when a bank "provides reasonable methods by which the consumer may affirmatively consent."  74 Fed. Reg. at 59,042 (emphasis added).  But it stretches Regulation E beyond its breaking point to

conclude the phrase "among other things" covers any conduct arguably misleading or deceptive, or otherwise prohibited by the CFPA.  Indeed, by such a construction, nearly anything could be shoehorned to fit within Regulation E, giving the Bureau nearly unbridled authority to allege a violation – notwithstanding the precision with which the Regulation paints.

Finally, the Bureau also points to Regulation E's preamble, providing that its purpose was to "ensure consumers are given a *meaningful choice* regarding overdraft services."  (Mem. in Opp'n at 28.)  But that concern is nowhere undermined by the Court's narrow interpretation of the term "reasonable opportunity."  Regulation E makes clear that consumers are afforded meaningful choices in overdraft services by mandating specific disclosures regarding those services, requiring banks to obtain an affirmative opt-in, and offering several alternative ways to make that opt-in decision.  Construing the phrase "reasonable opportunity" to apply only to the *means* of providing consent does not otherwise eradicate a "meaningful choice."

*"Affirmative consent."*  The Bureau also alleges that TCF violated Regulation E by failing to obtain customers' "affirmative consent."  But in support, it recycles its argument that TCF *misled* customers about overdraft services.  In particular, it argues TCF used a "confusing" telephone script that failed to adequately inform *existing* customers about the services, and presented opt-in information to *new* customers in a way that discouraged them from reading the required notice and suggested opt-in services were mandatory.  (See Mem. in Opp'n at 29-30.)

Once again, this argument misses the mark.  The Amended Complaint nowhere plausibly alleges that TCF failed to *actually obtain* customers' consent to overdraft services.  In fact, it alleges that after reading the so-called "confusing" script to existing customers, "*TCF employees were directed to ask the consumer to confirm his or her decision to opt in*."  (Am. Compl. ¶ 96 (emphasis added).)[9]  Similarly, the Amended Complaint nowhere suggests that TCF failed to obtain new customers' consent to overdraft services.  Instead, the Bureau's contention is that consumers failed to "affirmatively consent" because they did not understand what they were agreeing to, as a result of TCF's so-called misleading conduct.

This is fatal.  Again, Regulation E is specific:  it requires a bank to obtain "affirmative consent" and nothing more, and it is not infused with the CFPA's gloss of preventing "abusive" or "deceptive" conduct.  By the Bureau's reckoning, it would not be enough to obtain a customer's express (or "affirmative") consent, but rather a bank such as TCF would be required to obtain the customer's *informed* consent, lest it violate Regulation E.  As with the claim regarding a "reasonable opportunity," this simply seeks to squeeze the CFPA's broader proscriptions against misleading conduct into the Regulation.  The claim therefore fails for the same reason.[10]

---

[9] The Bureau alleges that while TCF employees were directed to ask the customer to confirm his or her opt-in decision, "[t]his did not always happen."  (Am. Compl. ¶ 96.)  The Court does not believe this conclusory allegation, devoid of any supporting detail, changes the calculus.  Indeed, it is notable that the allegation was absent from the initial 31-page, 124-paragraph Complaint.

[10] The Bureau also alleges that TCF failed to obtain "affirmative consent" because it conflated overdraft services for debit-card and ATM transactions (to which Regulation E applies) with such services for checks and Automated Clearing House (ACH) transactions (for which Regulation E is inapplicable).  "[B]y grouping together overdrafts on ATM, [debit card], check,

CASE 0:17-cv-00166-PAM-DTS   Document 89   Filed 09/08/17   Page 15 of 16

All told, the Court concludes that Counts III and IV of the Amended Complaint fail to plausibly allege violations of Regulation E, and they will be dismissed. Accordingly, the Court need not (and does not) reach TCF's argument that the Regulation E claims are time-barred to the extent they address conduct prior to March 2014.

## III.   The CFPB's constitutionality

Lastly, TCF argues that the Bureau is unconstitutionally structured "due to the lack of executive and congressional oversight."  (Def. Mem. at 41.)  The Court need not linger long on this argument.  For the reasons stated in <u>Consumer Financial Protection Bureau v. Future Income Payments, LLC</u>, __ F. Supp. 3d __, 2017 WL 2190069, at *5-9 (C.D. Cal. May 17, 2017), and elsewhere,[11] the Court disagrees.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that TCF's Motion to Dismiss (Doc. No. 37) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to the claims under Regulation E (Counts III and IV of the Amended Complaint), and those claims are **DISMISSED WITH PREJUDICE**.  The Motion is further **GRANTED** to the extent Counts I and II assert claims arising before July 21, 2011, the CFPA's effective date.  In

---

and ACH transactions[, TCF] suggested to consumers that they were opting in to the overdraft service for all four types of transactions, not just two," a purportedly "false" representation. (Mem. in Opp'n at 30.)  But while such a false representation might well violate the *CFPA*, there is no suggestion it could somehow defeat a customer's "affirmative consent" to overdraft services for ATM and debit-card transactions, which is what *Regulation E* requires.

[11] <u>See, e.g.</u>, <u>Consumer Fin. Prot. Bureau v. Navient Corp.</u>, No. 3:17-CV-101, 2017 WL 3380530, at *14-18 (M.D. Pa. Aug. 4, 2017); <u>Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.</u>, 219 F. Supp. 3d 878, 891-99 (S.D. Ind. 2015); <u>Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.</u>, 60 F. Supp. 3d 1082, 1086-92 (C.D. Cal. 2014).

all other respects, the Motion is **DENIED**.  The Bureau's Objection (Doc. No. 83) to

TCF's exhibits at the June 14, 2017 hearing is **OVERRULED** as moot.


Date:  September 8, 2017                         s/Paul A. Magnuson                    
                                                 PAUL A. MAGNUSON
                                                 United States District Judge